UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 19-CR-206 (RJL) |
| | ) | |
| FREDERICK BASS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

April 15, 2020 [Dkt. #14]

FILED
APR 15 2020
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Defendant Frederick Bass ("defendant" or "Bass") has filed a motion to suppress a firearm and ammunition seized from him on June 13, 2019, as the fruit of an illegal arrest. After considering the defendant's motion, the Government's opposition thereto, the testimony and evidence presented at the suppression hearing held on February 4, 2020, and the arguments of counsel, the Court DENIES defendant's motion to suppress tangible evidence.

**BACKGROUND**

In an indictment dated June 18, 2019, defendant Frederick Bass was charged with one count of Unlawful Possession of a Firearm and Ammunition by a Felon in violation of 18 U.S.C. § 922(g)(1). *See* Indictment [Dkt. #6]. The charge is based on evidence seized by police while investigating a traffic accident that occurred on Bowen Road in Southeast Washington, D.C. on June 13, 2019.

Around 7:45 that evening, Officer Kenan Thomas-Bartley ("Officer Thomas-Bartley" or "the Officer") of the Metropolitan Police Department responded to a call from

a female ("W-1") who reported being the victim of a hit-and-run traffic accident. Officer Thomas-Bartley activated his body-worn camera when he arrived at the scene of the accident. The body-worn camera footage and his testimony were admitted at the suppression hearing on February 4, 2020 and are the basis for the Court's finding of facts. *See* Ex. B, Body-Worn Camera Footage of Officer Thomas-Bartley ("BWC"); 2/4/2020 Hr'g Tr. ("Tr."). When the Officer arrived on the scene, he first spoke with W-1, who identified a man standing outside a car wash across a parking lot and stated, "He sideswiped my car out of anger, and I have it on video." BWC 2:14–28. She reported that the man was "drinking," "under the influence," and "belligerent." BWC 2:50–55, 4:30. When the Officer approached the man, he identified himself as Frederick Bass but stated that he did not have identification with him. BWC 3:25–58. In one hand, Bass was holding a plastic water bottle that was approximately one-third full of a clear, red liquid. *See* BWC 3:28.

Officer Thomas-Bartley asked Bass a series of questions, which he answered to varying degrees. Bass insisted that he was not involved in any traffic accident and that he had not been driving any car. BWC 3:27–45.[1] As he spoke, Bass sometimes slurred his words, *see* BWC 3:54–56, 5:07–18, 12:39–42, swayed back and forth, *see* BWC 11:02–12:17, and stumbled, *see* BWC 12:18–20. *See* Tr. 21–25. Because of this demeanor, the Officer suspected that Bass's water bottle might contain an alcoholic beverage. Tr. 21:21–22:3. When the Officer asked Bass whether he was "sippin' on Kool-Aid," Bass

---

[1] Though W-1's car showed signs consistent with being side-swiped, Tr. 19:2–10, she claimed that Bass with the help of others had hidden the car after the accident and that it was therefore no longer on the scene, Tr. 18:11–15.

responded: "It's juice." BWC 5:54–6:02. After speaking to Bass for several more minutes, the Officer stated to W-1 that Bass was "a little belligerent right now." BWC 8:54–57. Later, the Officer asked Bass whether he had "been drinking today," to which Bass looked directly at the red liquid in the water bottle he had been drinking and responded, "I have." BWC 11:21–26. When the Officer asked Bass whether the liquid was "jungle juice," a colloquial term for a mix of alcoholic beverages, Bass smiled and responded: "You could say that . . . if you want to." BWC 11:38–42. Officer Thomas-Bartley testified that, at that point, about ten minutes into his investigation, he concluded that Bass had alcohol in his water bottle. Tr. 25:19–23.

As such, Officer Thomas-Bartley decided to briefly detain Bass with his handcuffs. He testified that he did so because Bass had "started to stumble and fall into [him]," causing him to have to put his hand up to steady Bass. Tr. 24:16–23; *see* BWC 12:18–20. He asked Bass to put his water bottle down, BWC 12:25, and told him: "What I'm going to do right now, just 'cause you're all over the place, like I said, you're not under arrest, you're not under arrest. I'm going to put you in 'cuffs," BWC 12:43–55. When Bass asked "for what?", Officer Thomas-Bartley explained he was "being detained" and instructed him to "calm down." BWC 13:00–24. Bass resisted being handcuffed by stiffening his arms, but two police officers who had recently arrived on the scene managed to get Bass on the ground and handcuff him behind his back. BWC 13:00–14:04. As they got him on the ground, Sergeant Isaac Huff noticed a firearm in the waistband of Bass's jeans. BWC 14:00, 15:40–43; Tr. 31:14–32:9. The firearm, a Taurus G29 9 mm semi-automatic handgun, contained 12 rounds in the magazine and one in the chamber. The police arrested

Bass and, during a search incident to arrest, recovered a second loaded magazine in Bass's pant pocket. Tr. 33:19–23.

## ANALYSIS

An arrest must generally be supported by probable cause, which is information "sufficient to warrant a prudent [individual] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). However, not every police stop of a citizen necessarily constitutes an arrest. When a police officer has "a reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), he or she can conduct a brief investigatory stop, *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Reasonable suspicion is a "minimal level of objective justification for the stop," *Wardlow*, 528 U.S. at 123, and is a "significantly lower" standard than probable cause, *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007).

Defendant asks this Court to suppress the firearm and ammunition on the theory that the police's use of handcuffs transformed an investigatory stop into an arrest for which they lacked probable cause. I disagree. After a careful review of the body-worn camera footage, Officer Thomas-Bartley's testimony, and our Circuit's case law, I conclude that the police's stop of Bass was an investigatory stop supported by reasonable suspicion and that the officers' use of handcuffs was a reasonable means to detain him pending further investigation. How so?

First, Officer Thomas-Bartley had reasonable suspicion that Bass was engaged in criminal activity by driving under the influence of alcohol and carrying an opening container of alcohol. Several key facts support his reasonable suspicion initially that Bass

was driving under the influence of alcohol. When Officer Thomas-Bartley arrived on the scene, W-1 identified Bass and stated that he had been drinking and driving "under the influence." BWC 2:14. She also stated that she had a post-accident video where she confronted Bass and he was slurring his words. *See* BWC 2:14–28.[2] Additionally, W-1's car showed signs of being side-swiped, further corroborating her story. At that point, the Officer had more than enough reason to believe that Bass had been drinking and driving and to briefly stop him in order to further investigate. *See, e.g., Navarette v. California*, 572 U.S. 393, 397–99, 401–02 (2014) (even an anonymous tip that the tipster's car was run off the road by a drunk driver, when corroborated by certain details, had sufficient indicia of reliability for reasonable suspicion to justify an investigatory traffic stop).

Of course, when he spoke to Bass himself, the Officer developed a reasonable suspicion of yet another crime: carrying an open container of alcohol. When Officer Thomas-Bartley initially approached him, Bass was holding a water bottle filled with a clear, red liquid. *See* BWC 3:28. Based on his experience as a policer officer, Officer Thomas-Bartley suspected that this liquid might contain alcohol. *See* Tr. 21:19–22:3. That suspicion was confirmed when he observed Bass's slurred speech and clumsy movements. *See* Tr. 21:23–22:3, 23:11–23. Ultimately it was verified when Bass admitted that he had been drinking and when he implied that he was carrying "jungle juice." *See* Tr. 25:13–23. These observations were of course consistent with W-1's initial statements that Bass was

---

[2] Even though W-1 did not show the police officers the video until after Bass had been arrested, *see* Ex. E, Body-Worn Camera Footage from Officer Rowley, her statement that she had a video demonstrated to police that she could substantiate her claims, making them somewhat more credible.

"under the influence" and was continuing to drink, *see* BWC 2:50–55, which provide additional support for Officer Thomas-Bartley's conclusion. *See Adams v. Williams*, 407 U.S. 143, 147 (1972) (information reliably supplied by another person can supplement officer's personal observation). To say the least, the Officer had reasonable suspicion that Bass was engaging in further criminal activity.

Defendant, however, argues that the officers' use of handcuffs on him about ten minutes into the investigatory stop turned it into an arrest that required probable cause. *See* Mot. to Suppress Tangible Evid. at 3 [Dkt. #14]. Defendant relies on *United States v. Smith*, 373 F. Supp. 3d 223 (D.D.C. 2019), where the district court held that the officers' handcuffing of a calm, responsive, and compliant suspect merely based on smelling PCP in the area transformed an investigatory stop into an arrest. The circumstances here are quite different from *Smith*. The Officer here had much more reliable indicia supporting that the suspect was under the influence, and Bass was disorderly and stumbling, not calm and compliant, when the Officer made the decision to handcuff him. *See Smith*, 373 F. Supp. 3d at 238 (noting cases where courts have upheld use of handcuffs for safety reasons).

Our Circuit has long held that police officers may reasonably handcuff an individual in order to maintain the status quo while they continue their investigatory stop. *See United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976). This is precisely what Officer Thomas-Bartley did. Among the circumstances courts consider when evaluating when a stop ends and an arrest begins include "the officer's intent in stopping the citizen; the impression conveyed to the citizen as to whether he was in custody or only [being] briefly detained for

6

questioning; the length of the stop; the questions, if any, asked; and the extent of the search, if any, made." *United States v. White*, 648 F.2d 29, 34 (D.C. Cir. 1981) (footnotes omitted). The Officer here testified that he felt he needed to detain Bass because he was "all over the place." Tr. 27:1–11. The Officer also clearly told the defendant that he was not under arrest. *See* BWC 12:43–55. As such, Officer Thomas-Bartley acted reasonably in attempting to handcuff Bass to detain him. Only when Bass resisted did the officers take him to the ground in order to effectuate the handcuffing. That, of course, resulted in his shirt sliding up and exposing the firearm secreted in his waistband. *See* BWC 13:00–14:04. Because the police officers' handcuffing of Bass did not transform the investigatory stop into an arrest, the firearm and ammunition recovered are not the fruit of an unlawful arrest and need not be suppressed.

However, even if the police officers' handcuffing of Bass did turn an investigatory stop into an arrest, the officers had probable cause, not just reasonable suspicion, to believe Bass was committing the second offense: carrying an open container of alcohol. In the District of Columbia, it is a misdemeanor offense to "drink . . . or possess in an open container an alcoholic beverage in . . . [a] street, alley, park, sidewalk, or parking area." D.C. Code § 25-1001(a)(1), (d). A police officer who has probable cause to believe a person is committing an offense in his presence may arrest that person without a warrant. D.C. Code § 23-581(a)(1)(B). Probable cause exists where the arresting officers have "facts and circumstances within [their] knowledge" that are "reasonably trustworthy" and would "warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Draper v. United States*, 358 U.S. 307, 313 (1959). Probable cause

7

does not require an absolute certainty, only a "probability or substantial chance" that a crime was committed. *See Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). The facts that Bass was carrying a water bottle full of red liquid, that he smirked and implied confirmation that the liquid was "jungle juice," that he was slurring his words and stumbling, and that W-1 stated he was under the influence, among other circumstances, would easily warrant a reasonable person to believe that Bass was carrying and drinking from an open container of alcohol. *See United States v. Washington*, 670 F.3d 1321, 1324–25 (D.C. Cir. 2012).

## CONCLUSION

For all of the foregoing reasons set forth above, the Court DENIES defendant's Motion to Suppress Tangible Evidence [Dkt. #14]. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge